UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SONOMA COUNTY ASSOCIATION OF RETIRED EMPLOYEES,

           Plaintiff,

-against-

SONOMA COUNTY,

           Defendant

Case No. 15 MISC 218

SONOMA COUNTY ASSOCIATION OF RETIRED EMPLOYEES' NOTICE OF MOTION AND MOTION TO COMPEL THE SEGAL GROUP TO PRODUCE DOCUMENTS IN COMPLIANCE WITH SUBPOENA; MEMORANDUM OF POINTS AND AUTHORITIES

Date: August 25, 2015
Time: 11 a.m.

## NOTICE OF MOTION AND MOTION

Please take notice that the Sonoma County Association of Retired Employees ("SCARE") will and hereby does move for an order granting its Motion to Compel the Segal Group to Produce Documents in Compliance with Subpoena pursuant to Federal Rule of Civil Procedure 45(d)(2)(b)(i). This Court has jurisdiction over this dispute as compliance with the subpoena at issue is required in the Southern District of New York. In support of this Motion, SCARE will rely upon the Memorandum of Points and Authorities filed herewith, the Declaration of Genevieve Casey and attached exhibits filed herewith, the complete file in *Sonoma County Association of Retired Employees v. Sonoma County*, No. 09-4432 CW (N.D. Cal.), and any other written or oral argument as may be requested or permitted by the Court pursuant to Local Civil Rule 6.1(c). Should the Court require oral argument, the return date requested is Tuesday, August 25, 2015 at 11 a.m.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

In the underlying action, SCARE, a retiree association, alleges that in 2008, Sonoma County, California (the "County") broke over four decades' worth of promises to its employees that they would receive the same contributions to medical benefits in retirement as active employees receive. The County did so by simultaneously cutting contributions to both active employees' and retirees' medical benefits to a flat $500 per month, while extending a flat $600 in cash per month to only active employees, which they could use to make up the reduction in the County's medical benefit contributions. To orchestrate this cutback, the County hired an outside law and consulting firm, Renne, Sloan, Holtzman, Sakai LLP ("RSHS") to negotiate it with County labor unions, and an outside actuarial firm, the Segal Group ("Segal"), to help develop and cost out the proposal to take to the bargaining table. Since then, the County and its third-party consultants have used overbroad assertions of attorney-client privilege and work product—for non-legal communications about labor negotiations and calculations of the costs of health benefits—as well as unsupported assertions of deliberative process privilege to cloak the entire process in secrecy. These overbroad assertions have been applied to documents covering conceptualization of the scheme, negotiation of the scheme, and ultimately implementation of the scheme.

In July 2014, SCARE served the Segal Group ("Segal") with a third-party subpoena demanding production of documents related to this process, but Segal has by and large refused, withholding over 500 documents on spurious assertions of attorney-client privilege, work product, and deliberative process privilege. SCARE now seeks immediate production of these documents.[1]

---

[1] Both the County and RSHS have similarly withheld documents on these grounds, while Dania Torres Wong, an attorney at RSHS who served as the County's lead negotiator for at least two labor negotiations in or around 2008, was instructed not to answer and/or refused to answer deposition questions on these grounds. Such withholding, instructions not to answer, and refusals to answer are the subject of concurrent motions to compel in the Northern

## II.  BACKGROUND

**A.  Factual Background.**

SCARE brought the underlying action against the County in the Northern District of California in September 2009. *Sonoma County Ass'n of Retired Employees v. Sonoma County*, 2015 WL 1870841, at *1 (N.D. Cal. Apr. 23, 2015). SCARE's principal allegations are set forth in its pending motion for partial summary judgment. *See Sonoma County Ass'n of Retired Employees v. Sonoma County*, No. 09-4432 CW (N.D. Cal. May 28, 2015), ECF No. 166. To summarize, SCARE contends that the County promised its employees as far back as 1964 that it would provide them with the same contributions to medical benefits as retirees that it provided to active employees. *See id.* From 1989 on, this promise was enshrined in collective bargaining agreements, known as Memoranda of Understanding ("MOUs"), with the County's various employee unions. *See id.* However, in 2008, concerned with the perceived cost of funding retiree medical benefits as a result of new accounting standards, the County took steps to drastically cut back its contributions to retiree medical benefits. *See id.* In particular, as a way of trying to get around the historical and contractual "tie" to active employees, the County cut its contributions to both retirees' and active employees' medical benefits from 85% of the premium for the lowest cost plan offered by the County to a flat $500, while simultaneously giving active employees $600 in cash, nominally to use as they saw fit but in actuality designed to evade the County's obligations to retirees. *See id.*

Segal is a consulting firm that has provided services to the County since approximately 2007. Its roles have included working with County staff to compare health plan design options and to clarify and track eligibility for retiree healthcare coverage; presenting information on the County's Governmental Accounting Standards Board ("GASB") obligations to County staff and labor groups; preparing actuarial analyses of the costs of post-employment benefits; and

---

District of California, where the litigation is pending and where compliance with the subpoenas to RSHS and Ms. Torres Wong is required.

attending and providing calculations related to contract negotiations between the County and labor groups. *See* Ex. 16[2] (Alilovich Dep. at 32:11-33:6, 116:14-118:8); Ex. 17 (Drumm Dep. at 129:11-130:7, 208:25-209:20); Ex. 11 (Chadbourne Dep. at 142:21-144:1, 204:18-206:10); Ex. 8 (SONOMA-H-508056-73) (referencing Segal employee Tom Morrison as the "Subject Matter Expert on County health proposals"). During this period, personnel from RSHS worked for the County in two roles: as the County's labor negotiators and as outside counsel providing legal advice on a range of labor issues. In both roles, RSHS personnel were often included in communications between the County and Segal. Based on descriptions in Segal's log, in some cases, the purpose of such communications was to obtain RSHS attorneys' legal advice, but at other times, the purpose of including RSHS personnel was to facilitate their work as the County's labor negotiators or simply as a routine practice meant to keep them abreast of County staff's frequent communications with Segal regarding Segal's actuarial work. *See* Ex. 2.

Of particular relevance to this litigation, Segal and RSHS were both involved in a process culminating in 2008 whereby the County considered various options for addressing the cost of its retiree medical benefits, ultimately deciding to drastically cut its contributions for active employees' and retirees' medical benefits to $500 per month, while simultaneously giving active employees $600 in cash to make up for these cuts. *See generally* Mot. for Part. Summ. J. §§ II.D, II.E.1, *Sonoma County Ass'n of Retired Employees v. Sonoma County*, No. 09-4432 CW (N.D. Cal. May 28, 2015), ECF No. 166.

Because County emails were automatically purged after 60 days, a policy in place until the County implemented a litigation hold in June 2009, Segal is likely the only source for much electronically stored information ("ESI") related to its work for the County during the period between 2007 and the present. *See* Ex. 18 at Nos. 14, 15.

---

[2] All citations to exhibits are to the exhibits to the Declaration of Genevieve Casey filed herewith, unless otherwise noted.

**B.      Procedural History of Segal Subpoena and Meet and Confer over Privilege Issues.**

On July 22, 2014, SCARE served Segal with a subpoena requesting documents and communications relating to the provision of health benefits for County retirees. Ex. 3. Segal objected to the subpoena on August 1, 2014, arguing that Segal was "unable to identify and produce responsive documents relevant to the litigation." Casey Decl. ¶ 5; Ex. 5. Counsel for SCARE responded in an attempt to narrow the scope of the documents sought and, after extensive meet and confer, Segal did in fact produce a significant volume of documents by April 1, 2015, after holding up production to allow for the County's counsel to conduct a privilege review. Casey Decl. ¶ 6. Segal did not provide SCARE with a privilege log until April 24, and that log lacked descriptive information for each document sufficient to allow SCARE to evaluate the claims of privilege. *Id.* ¶¶ 7-8. On June 18, Segal produced an updated log[3] with amendments intended to correct the deficiencies SCARE had identified, followed by a number of previously withheld documents. *Id.* ¶¶ 6, 8. On June 24, SCARE wrote to Segal, arguing that Segal's log reflected many overbroad privilege claims. *Id.* ¶ 9. Segal replied two days later, requesting a "full list of the documents [SCARE] is disputing the assertion of privilege over," but also stating that it "will not produce any disputed documents until the County and SCARE resolve" ongoing disputes over documents withheld by the County. *Id.* ¶ 10.

In order to provide the list requested by Segal and therefore to move the meet and confer process forward, SCARE made two requests that Segal provide its privilege log in a fully searchable format rather than the poorly scanned document it had provided, but Segal did not cooperate. *Id.* ¶ 11. On July 14, SCARE wrote to Segal with a list of privilege log row numbers corresponding to the documents SCARE asserted were improperly withheld and informed Segal that it intended to move to compel Segal to produce those documents. *Id.* ¶ 12.[4]

---

[3] Counsel for Segal represented to SCARE that its log was prepared by counsel for the County. Casey Decl. ¶ 11.
[4] Newly appointed counsel for Segal in this matter, Michael Prame of the Groom Law Group, asked counsel for SCARE on July 17, 2015, to consent to filing this motion in the Northern District of California rather than in the Southern District of New York. Casey Decl. ¶ 24. SCARE evaluated his proposal and agreed to do so in the interest of judicial efficiency, but Mr. Prame then retracted his proposal, insisting instead that SCARE file in the Southern

## III.     ARGUMENT

Segal's assertions of attorney-client privilege are overbroad as to documents that are not communications for the purpose of seeking or receiving legal advice from lawyers, but rather are communications intended to facilitate Segal's actuarial work in support of the formulation of County policies and collective bargaining proposals. In some cases, the dominant role of the attorney in question was that of a labor negotiator, not an attorney, and in others, regardless of the attorney's role, the attorney was merely copied as a recipient of the document, rather than solicited for legal advice. Segal has also overreached by claiming that the work product doctrine should prevent disclosure of documents that were not prepared because of anticipated litigation. Finally, Segal has not established application of the deliberative process privilege for a number of documents that do not qualify, being neither predecisional nor deliberative in nature as the law requires.

**A.     Segal's Attorney-Client Privilege Claims Are Invalid Because the Communications Were Not for the Purpose of Seeking Legal Advice from Lawyers.**

Assertions of attorney-client privilege over the documents at issue here present two related legal questions: (1) whether communications that include third-party, non-attorney consultants are subject to attorney-client privilege, and (2) whether communications with individuals acting as labor negotiators, not as attorneys, are subject to attorney-client privilege.

**1.     Legal Standard.**

The attorney-client privilege should be construed narrowly so as not to impede the requesting party's right to obtain the evidence necessary to pursue its claims. *See In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973). A communication between a client and a consultant where an

---

District of New York as originally planned, after which he intended to move to transfer the motion to the Northern District of California. *Id.* at 25-26. SCARE objected that to proceed in this manner would be inefficient and prejudicial, but Mr. Prame refused to reconsider. *Id.* at 27. In light of this, SCARE requests that, if the matter is transferred to the Northern District, the Court order Segal to pay the additional costs incurred by SCARE in having initially filed in New York (i.e., the Court's filing fees for the motion to compel and for a motion for admission *pro hac vice*, and fees paid to a New York City vendor to receive and file the initiating documents on paper as required by the Court).

attorney is also present (e.g., copied) is not automatically rendered subject to the attorney-client privilege; the privilege only applies if the communication is being made "in confidence for the purpose of obtaining *legal* advice *from the lawyer*." United States v. *Adlman,* 68 F.3d 1495, 1499-500 (2d Cir. 1995) (citing *United States* v. *Kovel,* 296 F.2d 918, 922 (2d Cir. 1961)) (emphasis in original).

Where individuals participating in or copied on communications between consultants and their clients happen to be attorneys but are acting in their capacity as labor negotiators, not legal counsel, the claim of attorney-client privilege is especially weak, because communications with such labor negotiators would not be attorney-client privileged even if the non-attorney actuarial consultants were not also present. See *J.P. Foley & Co. v. Vanderbilt*, 65 F.R.D. 523, 526-27 (S.D.N.Y. 1974); *Brinckerhoff v. Town of Paradise*, 2011 WL 2926936, at *2-3 (E.D. Cal. July 15, 2011) (when an attorney serves a dual role, whether or not communications with her are attorney-client privileged depends on whether the "dominant purpose" of the communication and the attorney's work is legal or non-legal) (citing *2,022 Ranch, L.L.C. v. Super. Ct.*, 113 Cal. App. 4th 1377 (2003)); *Vieste, LLC v. Hill Redwood Dev.*, 2010 WL 4807058, at *7 (N.D. Cal. Nov. 18, 2010); *Marten v. Yellow Freight Sys.*, 1998 WL 13244, at *6 (D. Kan. Jan. 16, 1998) ("an attorney may have multiple roles . . . (e.g. . . . labor negotiator) that are not necessarily attorney-related roles for the purpose of the privilege"). This limitation of the scope of the attorney-client privilege is necessary to prevent the perverse incentives that would result if entities could shield their actions from view by hiring someone who happens to be an attorney for an essentially non-legal role. To protect communications to and from a labor negotiator who happens to be an attorney would be to "'reward those organizations able to hire attorneys as their negotiators because their communications concerning pending negotiations would be protected, whereas the communications of organizations with lay negotiators would not receive protection.'" *Brinckerhoff*, 2011 WL 2926936, at *2 (quoting *Montebello Rose Co. v. Agric. Labor Relations Bd.*, 119 Cal. App. 3d 1, 32 (1981)). If there is overlap in an attorney's legal and non-legal roles,

the correct solution is to separate non-legal documents or portions of documents from those pertaining to legal advice. *Id.*

### 2. Segal Wrongfully Withheld Communications That Do Not Even Involve an Attorney or Where Counsel Is Copied as a Matter of Practice, Not for the Purpose of Seeking Legal Advice.

Segal seeks to prevent disclosure of a large number of documents on the grounds of attorney-client privilege simply because an attorney was copied on the communication, but these privilege claims are overbroad where the purpose of the communication was to obtain Segal's actuarial services rather than to obtain "*legal* advice *from the lawyer.*" *See Adlman*, 68 F.3d at 1499-1500. Instead, the challenged documents in this category seem to be communications required as a routine part of Segal's provision of actuarial services for the County, with County counsel or other attorneys occasionally copied as a matter of course, but with no legal advice being sought or provided. *See* Ex. 1 § II. For example, an email from County Employee Benefits Manager Cristine Alilovich to Human Resources Director Ann Goodrich regarding the County Benefits Department's April 2008 proposed work plan for retiree health insurance does not appear in any way intended to seek legal advice, notwithstanding the fact that attorneys are among the numerous people copied on the communication. *See* Ex. 2 Rows 229-30.

Furthermore, a large number of documents have been withheld on attorney-client privilege grounds despite the fact that no attorneys are listed as senders or recipients of the documents in question. *See, e.g.*, Ex. 2 Rows 341-50 (string of emails between Segal personnel and County staff regarding SEIU negotiations, with no attorneys included). *See generally* Ex. 1 § II. B. These are by their very nature not privileged and must be produced. Where they may relay or recount specific legal advice provided by a lawyer (which is not indicated on Segal's log), they must be redacted selectively, not withheld entirely.

### 3. Communications with Individuals Acting in Their Roles as Labor Negotiators Are Not for the Purpose of Seeking Legal Advice from a Lawyer, and Are Therefore Not Attorney-Client Privileged

Segal's assertions of attorney-client privilege are unfounded as to communications between County staff and Segal personnel that also included individuals acting in their capacities as labor negotiators rather than as attorneys. Deposition testimony, the County's log, and publicly available information make it clear that personnel from RSHS served as the County's labor negotiators and consultants, including Dania Torres-Wong, Emily Prescott, and Scott Kenley. *See* Ex. 9 (Andersen Dep. at 53:22-2, 127:13-20, 168:8-169:23); Ex. 10 (Murphy Dep. at 70:9-12, 77:2-6); Ex. 11 (Chadbourne Dep. at 172:4-173:19); Ex. 12 (Deis Dep. at 95:1-7, 102:8-104:15); Ex. 13 (Goodrich Dep. at 79:6-80:18); Ex. 14 (Chrystal Dep. at 72:4-6, 85:15-24, 136:18-137:14, 184:5-22, 190:2-13); Ex. 15 (Torres Wong Dep. at 37:14-41:11, 54:5-55:5, 59:22-61:8, 64:8-65:18, 70:5-71:2); http://publiclawgroup.com/people/ (last visited Mar. 27, 2015) (Scott Kenley is a member of the firm's "non-legal services division").

Segal has not demonstrated that the "dominant purpose" of the vast majority of withheld communications with RSHS was privileged provision of legal advice, as opposed to the non-privileged subject of negotiation with its unions. *See* Ex. 1 § II.A. Withholding such documents on grounds of attorney-client privilege is precisely the type of abuse *Brinckerhoff*, *Marten*, and other cases sought to curb. A bar card is not a license to shroud in a cloak of secrecy everything an attorney touches, legal or not. While SCARE has attempted to identify only those withheld documents that appear to pertain to labor negotiations, rather than legal advice, to the extent legal advice is also contained therein, the preferable practice is to produce such documents with the specific legal advice redacted and the remaining information regarding labor negotiations—such as labor negotiation strategy, draft proposals, and non-legal research into various proposals—left unredacted. *See, e.g., Int'l Cards Co. v. Mastercard Int'l Inc.*, 2014 WL 4357450, at *4 (S.D.N.Y. Aug. 27, 2014) (ordering that documents containing a mixture of privileged and non-privileged material be redacted and produced).

**B.     Segal's Work Product Claims Are Invalid Because the Documents Were Not Prepared in Anticipation of Litigation**

A party seeking to prevent disclosure of a document based on the work product doctrine must show that it was prepared "*because of* the prospect of litigation." *United States v. Adlman*, 134 F.3d 1194, 1202-1203 (2d Cir. 1998) (citation omitted). It is "well established" that the work product doctrine does not prevent disclosure of documents that are prepared in the ordinary course of business or that would have been created "in essentially similar form" even if no litigation were anticipated. *Id.* at 1202. Work product protection is qualified; even if a document is found to be work product, if the party seeking disclosure establishes a "substantial need for the document and an inability to obtain its contents elsewhere without undue hardship," a Court may order its disclosure. *Id.* at 1202-1203.

Segal's privilege log does not make the requisite showing that documents withheld pursuant to the work product doctrine were prepared "because of" anticipated or ongoing litigation. *See* Ex. 1 § III. Instead, the work product designation seems to have been arbitrarily applied to some of the documents as to which Segal also claimed attorney-client privilege. In SCARE's disputes with the County concerning the County's withholding of documents on work product grounds, the County has taken the position that because negotiations during this time period were often contentious, all material related to bargaining sessions and not exchanged with the unions themselves is work product, because litigation over the disagreements between the County and the unions might ensue. However, the possibility of future litigation is not enough to establish work product protection. As the Second Circuit made clear in *Adlman*, where the challenged documents were not prepared *because of* anticipated litigation they are not protected by the work product doctrine. It is untenable to maintain that the same types of documents as were prepared for many other negotiations—such as draft proposals, internal communications regarding draft proposals, and notes from bargaining—are conveyed work product protection simply because the 2008 negotiations were notably contentious. Insofar as the Court finds that any documents in this category are work product, they should nevertheless be produced, as they

are highly relevant to this litigation and likely unavailable from other sources, as explained above in section II.A.

C. **Segal Has Not Established Application of the Deliberative Process Privilege**

The deliberative process privilege[5] applies to "predecisional," "deliberative" documents "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Tigue v. United States Dep't of Justice*, 312 F.3d 70, 76-77 (2d Cir. 2002) (citation omitted). "Deliberative" means the document is "indicative of the agency's thought processes"; factual material that does not reveal the decision-maker's deliberative process is not protected. *Local 3, Int'l Bhd. of Elec. Workers, ADL-CIA v. N.L.R.B.*, 845 F.2d 1177, 1180 (2d Cir. 1988). The party claiming privilege must be able to indicate which specific policy decision the document relates to. *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, 643 F. Supp. 2d 439, 442 (S.D.N.Y. 2009). The deliberative process privilege is qualified; factors favoring disclosure include the relevance and importance of the materials to the requesting party's case, the availability of the documents from other sources, the strength of the requesting party's case, and the importance of the disclosure to the public interest. *Id.* (citation omitted). Highlighting how narrowly this privilege should be construed, assertions of deliberative process privilege may only be made by the head of the public agency after review of the material in question. *See id.* at 443.

---

[5]For nearly every document Segal has withheld on the basis of the deliberative process privilege, it has also claimed a state law "closed session" privilege. However, "[t]he Federal law of privilege should be applied with respect to pendent State law claims when," as here, "they arise in a Federal question case." Fed. R. Evid. 501 adv. comm.'s note (1974). The closed session provision of California law is not recognized under federal law, nor does it even establish an evidentiary privilege. *N. Pacifica LLC v. City of Pacific*, 274 F. Supp. 2d 1118, 1126 (N.D. Cal. 2003); *Kaufman v. Bd. of Trs.*, 168 F.R.D. 278, 280 (C.D. Cal. 1996). Thus, Segal's closed session claims are invalid.

Even if federal law recognized such a privilege, most documents Segal withheld on that basis would not qualify. California law provides that "a person may not disclose confidential information that has been *acquired by being present in a closed session* authorized by [the Act]." Cal. Gov't Code § 54963(a) (emphasis added). The withheld documents are generally communications between or background materials prepared by County staff and consultants *prior* to closed session meetings. Ex. 1 § IV.

The documents withheld on grounds of deliberative process privilege do not reveal decision-makers' mental processes, but instead appear to reflect factual material prepared in advance of Board of Supervisors' meetings or communications between County staff and Segal personnel preparing material to be distributed at such meetings. *See* Ex. 1 § IV. Moreover, disclosure of background material on the costs of benefits prepared by County staff and actuaries and distributed to the Board of Supervisors for their use during meetings held years ago is unlikely to inhibit County decision-makers from candidly communicating in the future. *See Tigue*, 312 F.3d at 76. For example, studies on retirees' health plans and contribution levels prepared in advance of a closed session meeting, presumably by actuaries and/or County benefits staff, appear to be factual material intended to be consulted by the decision-makers (here, the Board of Supervisors) rather than "deliberative" documents reflecting Supervisors' opinions or behind-the-scenes debates. *See* Ex. 2 Rows 25-27. Similarly, an email and attachments sent between County staff, with a labor negotiator copied, concerning County proposals to be made at the bargaining table, are not "deliberative" because they do not reveal decision-makers' (i.e., the Board of Supervisors') thought processes; nor has the County or Segal established that they are "predecisional," not having identified the specific, significant policy decision to which they relate. *See* Ex. 2 Rows 36-40. Furthermore, even if the Court finds these documents to be deliberative and predecisional in nature, disclosure is still warranted, because the documents may contain highly relevant evidence of the County's understanding and intent regarding changes it made to retiree healthcare coverage beginning in 2008, and the information contained in them may not be available from any other source.

## IV.     CONCLUSION

For all of the foregoing reasons, SCARE respectfully requests that the Court compel Segal to produce the documents listed on Ex. 1 in the format required by the subpoena.

//

//

Dated: July 20, 2015

Respectfully submitted,

By: _____
Bill Lann Lee
LEWIS, FEINBERG,
LEE & JACKSON, P.C.
476 9th Street
Oakland, CA 94607-4048

*Attorneys for Plaintiff*

SONOMA COUNTY ASSOC. OF RET. EMPLOYEES'
MOTION TO COMPEL SEGAL TO PRODUCE
DOCUMENTS PURSUANT TO SUBPOENA

- 13 -